**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| DR. SUSANNE P. WAHBA, ET AL., | § | |
|     Plaintiffs | § | |
| | § | |
| Vs. | § | CIVIL ACTION NO. 2-03-CV-90 (TJW) |
| | § | |
| NATIONAL BANK OF EGYPT, | § | |
|     Defendant | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

## I.    Introduction

Mahmoud A. Wahba ("Wahba"), his family and certain companies sued the National Bank of Egypt ("NBE"), asserting jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").[1] The plaintiffs' claims are based on the seizure of certain Egyptian assets by an arm of the Egyptian government.[2] In its prior memorandum opinion, the court determined that the plaintiffs had pleaded a *prima facie* case of jurisdiction under the FSIA sufficient to allow jurisdictional discovery. The record developed by the parties, however, persuades the court that it lacks jurisdiction under the FSIA. The court therefore grants the NBE's motion to dismiss for lack of subject matter jurisdiction (#14).

---

[1]    The plaintiffs include Mahmoud A. Wahba, Susanne P. Wahba, James T. Wahba, John B. Wahba, Timothy R. Wahba, Mai M. Wahba, Champion Holding Company, Champion Trading Company, and Ameritrade International.

[2]    The plaintiffs sued the NBE for theft, conversion, expropriation of assets in violation of international law, economic duress and coercion, breach of fiduciary duty, breach of the duty of good faith and fair dealing, breach of constructive trust, usury, fraud, and breach of contract in relation to the NBE's seizure.

II.    **Factual Background**

In the mid-1990s, the Egyptian government decided to reform the centrally controlled

Egyptian cotton industry through privatization.  To carry out its goal of privatization, the Egyptian

government began looking for persons with expertise in the cotton commodity market to aid in the

transformation from a centrally controlled cotton market to one based upon private enterprise.

Wahba was the founder of the Egyptian American Business Association and was recognized as a

specialist in commodities trading and hedging techniques, particularly in cotton.[3]   The NBE

approached Wahba to make a joint investment with the NBE in private cotton ginning and trading

activities.  As a result, in July 1994, Wahba and the NBE created the National Cotton Company

(hereinafter "NCC").  Through NCC, Wahba and the bank began to conduct business in the Egyptian

cotton market.[4]

The NCC's purpose was to trade in cotton and its by-products in domestic and foreign

markets, including the United States.[5]   The NBE financed the NCC's purchase of cotton from

Egyptian farmers.  During the 1994-95 season, the NCC produced large profits, and this led Wahba

---

[3]     Wahba and the other plaintiffs also owned interests in several other Egyptian
companies, including Champion Vegetable Oil Company, Egyptian National Vegetable Oil
Company (hereinafter "ENVOCO"), and Al Almaia for Food and Protein (manufactured protein
meals for the poultry and livestock feeding industry).  The plaintiffs also owned a controlling
interest in Sila Edible Oil Company and were investors in a major eyewear factory in Egypt, Arab
Company for Optics.  In addition to their investments in Egyptian companies, the plaintiffs
owned real estate in Egypt, including an office building fronting the Nile River, a penthouse
apartment in Cairo, and a villa that once belonged to the sister of the former Egyptian king.

[4]     The Wahba family owned seventy-five percent of the NCC, while the NBE and its
employee pension fund owned twenty-five percent.  The NCC was an Egyptian joint stock
corporation.

[5]     The NCC maintained an office in the United States to manage its business affairs
here.

and his families to invest more heavily in the Egyptian markets.  Wahba used NBE as his lender to finance several large transactions.  Concomitantly, Wahba and his family began acquiring assets used in connection with their Egyptian companies.

To the benefit of NCC, cotton prices rose; however, this had an adverse effect on government-owned mills that employed a large number of Egypt's labor force.  After low production in the 1995-96 season drove prices higher again, the Egyptian government prohibited state-owned banks, such as the NBE, from financing companies that "speculated" on the Egyptian cotton market.  The Egyptian government also (1) forbade export of Egyptian long staple cotton, (2) prohibited the storing of cotton for more than thirty days, (3) imposed a minimum price for purchases from farmers; and (4) set the price at which holders of cotton, such as the NCC, would be required to sell to Egyptian textile companies.  The price at which holders of cotton were required to sell to textile companies was below the minimum price for purchases from farmers.  Because the new laws forbade the NCC from exporting long staple cotton, set the price of cotton sold to textile companies below the price the NCC paid for the raw cotton, and prohibited the NCC from storing cotton for more than thirty days, the NCC suffered enormous operating losses and saw a large reduction in the value of its cotton pledged as security.  In short, the NCC could not repay the loans its received from the NBE.

In an effort to resolve the NCC's financial problems, Wahba offered to withdraw from the NCC or cede his family's seventy-five percent interest in the NCC to the NBE for free.  The NBE rejected Wahba's offer.  Internally, the NBE stated:

> [i]t is a psychological reaction from the partner.  During a crisis, we must be patient.  The decision is up to us, and we have to calmly and gently express the fact that we do not agree, *and at the time that suits us we will achieve an exit for all of us*.

3

Plaintiffs' Response to Defendant's Motion to Dismiss, Exhibit 19 (emphasis added).  Wahba also offered to put all the cotton in NCC's storage facilities "in the hands of the bank."  *Id.*, Exhibit 21. The NBE rejected this offer, and instead demanded immediate repayment of the entire difference between the price NCC had paid for the cotton and the current market price set by the government. *Id.*, Exhibit 22.

As the 1996-97 season began, NCC effectively ceased operations.  At the August 19, 1996, NCC Board of Directors meeting, Wahba proposed liquidating the company.  *Id.*, Exhibit 27.  The NBE did not agree to the liquidation because it felt that the dissolution of the company was in the discretion of the bank creditors and that "the final dissolution of the company is not deemed the best solution as such dissolution will entail losses exceeding what is bearable."  *Id.*, Exhibit 27 at W043855.  The NBE also called on Wahba to "mortgage all investments and properties in Egypt for our bank's benefit (regardless of whether they are related to projects financed by our bank or self-financed or personally owned), and to get from you an irrevocable authorization to sell and mortgage [the investments and properties] . . . ."  *Id.*, Exhibit 29.  In a later meeting with Wahba on December 5, 1996, in New York, Sayed Kamer (an official with the NBE) stated the NBE demanded that Wahba, among other things:  (1) pledge all of his and his family's assets in Egypt as additional guarantees for NCC's debt; (2) sign post-dated checks representing future installments due to the bank; (3) take on personal liability for all of the consolidated loans; and (4) buy-out NBE's shares in NCC at a price that would return NBE its initial investment.  Kamer told Wahba that if Wahba did not agree to the restructuring, the bank would refer Wahba to the Socialist Prosecutor.

The Socialist Prosecutor is an arm of the Egyptian government, quasi-judicial in nature.

Despite the criticisms lodged against that system by plaintiffs' Egyptian law expert, this court remains mindful that the Socialist Prosecutor is an arm of a foreign sovereign.[6]  In Egypt, the Socialist Prosecutor is one of the means by which administrative attachment or foreclosure is effected.  As the NBE notes in its brief, the Socialist Prosecutor is a creature of Egyptian statute. Pursuant to that statute, the Socialist Prosecutor is authorized to impose "sequestration . . . on all or part of a person's properties or funds, in order to ward off his danger to society, if it is established by serious evidence that he committed deeds which are likely to prejudice the security of the country . . . or to harm the economic interests of the socialist society . . . .  See Law No. 34/1971 Reorganizing the Imposition of Sequestration and Ensuring the Safety of the People, Defendant National Bank of Egypt's Brief and Evidence in Support of Its Motion to Dismiss and Reply to Plaintiff's Production of Evidence Exhibit 44B; Declaration of Zeinab Aboul Farag, Exhibit 44, at ¶ 6.  According to the plaintiffs, a threat of referral to the Socialist Prosecutor carries with it serious repercussions.

Despite having been threatened with Socialist Prosecutor, however, Wahba refused to agree to most of the NBE's demands.  When Wahba next traveled to Egypt on February 26, 1997, officials from the NBE pressured Wahba to sign a "restructuring" agreement.  The parties' accounts of what happened next differ.  Wahba claims that the NBE officials coerced him into signing the "restructuring" agreement with the above demands by threatening to use the office and powers of the Socialist Prosecutor to prevent Wahba from leaving Egypt.  The NBE denies it coerced Wahba

---

[6]     Plaintiffs' expert states that the Socialist Prosecutor has "a commitment to a sub-standard standard of proof" and a "fondness for wholesale expropriation without due process as substantive sanction."  Plaintiffs' Response to Defendant's Motion to Dismiss, Exhibit 52 at p. 7. He also states that the threat of referral to the Socialist Prosecutor is sometimes used in Egypt as a tool to influence entrepeneurs into settling commercial disputes.  *Id.* at 8.

into signing the agreement, and instead argues that Wahba freely entered into the agreement which forgave large amounts of alleged interest and commission on the NCC's debt, granted grace periods, extended the terms of the loans, and reduced future interest rates.  Defendant National Bank of Egypt's Brief and Evidence in Support of Its Motion to Dismiss and Reply to Plaintiff's Production of Evidence, Exhibits 23, 43.  The NBE points out that Wahba was represented by counsel throughout the negotiations.

Although Wahba claims he was coerced into signing the restructuring agreement, Wahba wrote a letter on March 11, 1997, to the Chairman of the NBE, Mahmmoud Aziz, and thanked Mr. Aziz for "reaching to [sic] a settlement agreement with the National Cotton Company . . . . I confirm that the agreement will be performed in a way that satisfies the bank and the national interest in general."  Defendant National Bank of Egypt's Brief and Evidence in Support of Its Motion to Dismiss and Reply to Plaintiff's Production of Evidence, Exhibit 26.  The NBE points to the March 11, 1997, letter as evidence that Wahba was not coerced at all into signing the agreement but instead entered it voluntarily. Nevertheless, at the April 2, 1997, NCC Board of Directors meeting, NCC disapproved the agreement signed by Wahba in Egypt and determined that "such settlement was concluded under pressure practiced upon the company." *Id.*, Exhibit 36.

Eventually, Wahba filed suit in Egypt seeking to void the purported agreement based upon duress and coercion.  Wahba claimed that the NBE had threatened him into signing the agreement and that the threat was that NBE would "take legal procedures presented in levying administrative attachment to the property of the plaintiff."  The Egyptian court rejected this claim, stating that "such procedures are established by law so that the defendant Bank would receive rights in full toward the plaintiff and which are deemed legal means established by law and are not considered themselves

a means of coercion justifying invalidation of the contract."   In all, Wahba and his Egyptian companies have filed at least eight lawsuits in Egypt arising out of transactions with the NBE.

After Wahba refused to comply with the 1997 restructuring agreement, the NBE petitioned the Socialist Prosecutor and requested that Wahba be placed on a travel watch list and that any property located in Egypt owned by Wahba, his children, or business entities controlled by them be seized.  In response to the NBE's petition, the Socialist Prosecutor placed Wahba and his family on a travel watch list and began an investigation into Wahba and his business dealings.  The NBE also continued its efforts to convince Wahba to enter into a settlement agreement.[7]  At a NBE Board of Directors meeting on January 6, 1999, the directors discussed the value of Wahba's other companies located in Egypt and the desirability of the NBE possessing these companies in settlement of NCC's debt.  The summary of the NBE Board of Directors meeting stated:

> The alternative of proceeding with the legal actions may not achieve the desired results and may take a long time resulting in a decrease in the value of the companies and assets as most of them are not functioning currently as a result of the lack in working capital.  The legal actions might not lead us to where the proposed settlement might.  In addition, the client's assets may be seized by other creditors and our bank may not be able to receive all its dues in the same manner as suggested by the proposed settlement, keeping in mind the time factor as well.

*Id.*, Exhibit 42.  The chairman of the NBE board also stated:  "Is there any way . . . to convince the client to amicably hand over the rest of the assets?"  *Id.*

On June 24, 1999, Wahba's Egyptian lawyer met with representatives of the NBE to discuss

---

[7]        Between February, 1998, and January 6, 1999, Wahba and his attorney corresponded several times with NBE officials regarding possible terms of settlement.  One proposed offer of settlement by Wahba included the assignment of the ownership and assets of Champion Vegetable Oil Company and Envoco (Wahba owned companies), three cotton gins purchased by the plaintiffs and shipped to Egypt, a villa, as well as other concessions.  Defendant National Bank of Egypt's Brief and Evidence in Support of Its Motion to Dismiss and Reply to Plaintiff's Production of Evidence, Exhibit 32.

a settlement agreement.  The NBE agreed to forgive all of Wahba's remaining debts (totaling L.E. 342,400,000)[8] in exchange for the transfer of Wahba's Egyptian villa, the ownership and assets of Envoco and Champion Vegetable Oil Company, the assets owned by the NCC in Sila Vegetable Oil Company, three cotton gins located in Egypt, the cotton stored in NBE warehouses, all the eyeglasses and frames manufactured by Champion Optics Company and stored in NBE warehouses, and the termination of Wahba's and his companies' lawsuits against the NBE.  Defendant National Bank of Egypt's Brief and Evidence in Support of Its Motion to Dismiss and Reply to Plaintiff's Production of Evidence, Exhibit 32.  The NBE sent the settlement agreement to Wahba in the United States. Wahba took the settlement agreement to the Egyptian consulate in New York City and signed it on June 30, 1999.  However, Wahba left with the original copy of the agreement and did not send it to the NBE.

After leaving the Egyptian consulate, Wahba apparently changed his mind and never sent the original copy to the NBE.  Plaintiffs' Response to Defendant's Motion to Dismiss, Exhibit 4 at pp. 9-10 and Exhibit 8 at pp. 86-87.  He also never performed his obligations to effectuate the terms of the settlement.[9]  Plaintiffs' Response to Defendant's Motion to Dismiss, Exhibit 4 at p. 10, Exhibit

_____

[8]     "L.E." is the designation for Egyptian pounds.

[9]     The agreement presented to Wahba stated that all documents pertaining to the plaintiffs' companies and villa in Egypt were to be turned over to the NBE within fifteen days of the signing of the agreement.  The plaintiffs also were to complete all procedures of relinquishing their assets in Egypt and transferring them without reservation to the NBE within fifteen days.  If the documents and assets were not transferred within fifteen days, then the agreement was to be "considered revoked and as if [it] never existed."  Plaintiffs' Response to Defendant's Motion to Dismiss, Exhibit 51 at p. 12 ("Agreement Contract").  Wahba claims he never transferred any documents or completed any procedures relinquishing assets in Egypt.  An internal Bank memorandum also states "it is clear that from the beginning the client [Wahba] has not honored his obligations to implement the settlement."  Plaintiffs' Response to Defendant's Motion to Dismiss, Exhibit 43 at p. 11.

8 at pp. 86-87, and Exhibit 43.  After the NBE attempted to convince Wahba to send the original copy to the NBE, the bank "made informal and secret contact with the office of the Foreign Minister to . . . be provided with official extracts of the documents regarding the settlement [that were] ratified by the Egyptian Consulate in America."  Plaintiffs' Response to Defendant's Motion to Dismiss, Exhibit 43 at p. 9 (internal Bank memorandum).  According to the plaintiffs, the NBE used these official extracts to continue proceedings to expropriate the plaintiffs' property in Egypt to satisfy the alleged debt to the NBE.  On April 12, 2000, after conducting an investigation, the Socialist Prosecutor ordered the seizure of the plaintiffs' Egyptian assets.  Thereafter, on June 6, 2000, the Socialist Prosecutor declared the case settled and transferred all the assets listed in the copy of the agreement signed by Wahba to the NBE.

The plaintiffs instituted this suit to recover the value of the assets seized by the Socialist Prosecutor and delivered to the NBE.  In addition, certain plaintiffs instituted an arbitration proceeding against the government of the Arab Republic of Egypt, and that proceeding was pending before the International Centre for Settlement of Investment Disputes ("ICSIC"), Case No. ARB/02/09.  The ICSIC has jurisdiction over disputes between a defendant state and a "national of another state."  The arbitration panel decided, as a preliminary matter, the nationality of Mahmoud A. Wahba's three sons.  The panel noted that under Egyptian law, a child born of an Egyptian father automatically acquires at birth Egyptian nationality if at that time the father holds Egyptian nationality.  Because the panel found Wahba to be an Egyptian citizen, his children also were found to be Egyptian citizens.  The panel found that "[i]t is uncontested that the claimants did not produce any authorization by the Minister of the Interior allowing Dr. Mahmoud Wahba to renounce his Egyptian nationality upon acquiring his American nationality."  The panel observed, for instance,

9

that Mahmoud A. Wahba had acquired an Egyptian passport and identification card.  Moreover, the documents used to incorporate the NCC had noted Wahba's Egyptian nationality.  The arbitrators found that the complaining parties "in the documents setting up the vehicle of their investment, used their Egyptian nationality without any mention of their U.S. nationality."  In short, the panel concluded (at least with respect to these transactions), that Wahba and his sons were dual nationals and therefore that the ICSIC lacked jurisdiction over their claims.

In this case, the plaintiffs contend that the court has subject matter jurisdiction over their claims against the NBE under the expropriation exception as well as the commercial activities exception.  Initially, this court considered the plaintiffs' arguments on an undeveloped record and found that plaintiffs were entitled to discovery into their jurisdictional allegations.  The parties conducted discovery into those allegations and have now supplemented their filings as to the jurisdictional issues.  The court has conducted an extensive review of the factual record and is persuaded that it lacks subject matter jurisdiction over this case.

## III.   Discussion

### A.   Foreign Sovereign Immunities Act

This case involves a suit against an agency or instrumentality of a foreign country and as such is presumptively outside the jurisdiction of the federal courts.  The Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1601 *et seq.*, is the only way to exercise jurisdiction over a foreign state.[10] *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  The FSIA provides that "a foreign State shall be immune from the jurisdiction of the courts of the United

---

[10]     For a history of the concept of sovereign immunity in United States jurisprudence and the origins of the FSIA, *see Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 486-88 (1983).

States and of the States" unless one or more of the exceptions contained in §§ 1605-1607 apply.  28

U.S.C. § 1604.  Foreign state sovereign immunity exists to promote harmonious international

relations and effectuate general notions of comity among nations.  *Pere v. Nuovo Pignone, Inc.*, 150

F.3d 477, 480 (5th Cir. 1998).  Furthermore, FSIA grants immunity not only from liability, but also

from the burdens of litigation as well**.**  *United States  v. Moats*, 961 F.2d 1198, 1203 (5th Cir. 1992).

Unless one of the exceptions to immunity under the FSIA applies, a court must dismiss the case

against a foreign state.

A "foreign state" includes a political subdivision of a foreign state or an agency or

instrumentality of a foreign state as defined in § 1603(b).  28 U.S.C. § 1603(a).  "Agency or

instrumentality" is defined as any entity:

> (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ
> of a foreign state or political subdivision thereof, or a majority of whose shares or
> other ownership interest is owned by a foreign state or political subdivision thereof,
> and (3) which is neither a citizen of a State of the United States as defined in section
> 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

A party claiming FSIA immunity retains the ultimate burden of persuasion on immunity, but

it need only present a *prima facie* case that it is a foreign state.  *Byrd v. Corporacion Forestal y*

*Industrial de Olancho, S.A.*, 182 F.3d 380, 388 (5th Cir. 1999).  The burden then shifts to the party

opposing immunity to present evidence that one of the exceptions to immunity applies.  *Id*.  Despite

the shifting burden of production, the party claiming FSIA immunity retains the ultimate burden of

persuasion by a preponderance of the evidence that it is a foreign state and that none of the relevant

exceptions to immunity apply.  *Id*.

There is no dispute that the NBE is an Egyptian corporation formed pursuant to Egyptian law.

It is owned 100% by Egypt's Ministry of Finance, a political subdivision of the Egyptian Government.  Therefore, the NBE qualifies as an "agency or instrumentality" of a foreign state. *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 723 (9th Cir. 1996) (holding that the Central Bank of Nigeria is an "instrumentality" of the Federal Republic of Nigeria); *Barragan v. Banco BCH*,188 Cal. App. 3d 283, 295 (Ct. App. 1986)(holding that a Mexican bank formed as a corporate entity with a majority of its shares owned by the government of Mexico is an "agency or instrumentality").  As a result, the burden shifts to the plaintiffs to present evidence of the applicability of at least one of the exceptions to the FSIA.

B.      Exceptions to Sovereign Immunity Under the FSIA

As noted, there are exceptions to immunity under the FSIA.  The relevant statute, 28 U.S.C. § 1605(a)(2) and (3), states two exceptions that are applicable to the present case:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case–

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

The plaintiffs must establish that at least one of the exceptions apply to secure jurisdiction over the foreign sovereign.

## 1.    Expropriation Exception

The gravamen of plaintiffs' case is that they were wrongfully divested of their interest in Egyptian properties.  As a result, the expropriation exception would appear to have the most textual relevance to these claims.  It is possible, however, given the circumscription with which the Fifth Circuit drafted its January 12, 2004, order granting the NBE's petition for writ of mandamus, that the Fifth Circuit believes the exception to be inapplicable.[11]  This court's order of February 5, 2004, suggested that any discovery and determination of jurisdiction under the FSIA should be limited to the commercial activities exception.  Nonetheless, for the sake of completeness, the court will address jurisdiction under the expropriation exception as well.

The relevant section of 28 U.S.C. § 1605(a)(3) states:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case–

(3) in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.[12]

A state is responsible under international law for injury resulting from a taking by the state of the property of a national of another state in three situations:  (1) the taking is not for a public purpose, or (2) the taking is discriminatory, or (3) the taking is not accompanied by provision for just

---

[11]    The Fifth Circuit's order limited discovery to the "direct effects" clause of the commercial activities exception.

[12]    The statute also allows an exception to sovereign immunity when property is taken in violation of international law and "that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(3).  This exception is not applicable in the present case.

compensation.  RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES
§ 712 (1987).  *See, e.g., Altmann*, 317 F.3d at 968; *Siderman de Blake v. Republic of Argentina*, 965
F.2d 699, 712 (9th Cir. 1992), *cert. denied*, 507 U.S. 1017 (1993); *Crist v. Republic of Turkey*, 995
F. Supp. 5, 11 (D.D.C. 1998).  The expropriation exception does not apply, however, to a foreign
state's dealings with property owned by its own nationals.  *De Sanchez v. Banco Central de
Nicaragua*, 770 F.2d 1385, 1396-97 (5th Cir. 1985).

In this case, the documents tendered to the court reflect that Wahba held himself out as an
Egyptian citizen, notwithstanding the fact that the oath he took to become a United States citizen
required him to renounce that citizenship.  He confirmed in his deposition that he held an Egyptian
passport and an Egyptian identification card.  He also used his Egyptian passport to travel abroad.
As the arbitration panel found, the documents used to form NCC reflect that Wahba was of Egyptian
nationality.  Although Wahba testified in his deposition that the bank filled out the incorporation
forms and that he advised the NBE of his American citizenship, the objective evidence suggests
otherwise.  The Wahbas were the principal stockholders in NCC and the other Egyptian companies,
and they have pointed to no evidence that Wahba corrected the representations on the corporate
documents.  More to the point, Wahba does not explain how the bank could have been involved in
the issuance of an Egyptian identification card and four Egyptian passports to him from 1964 through
the present time.  Under this record, the expropriation exception does not apply.  From the NBE's
perspective, it was dealing with Egyptian assets owned by Egyptian corporations, the principal agent
of which was an Egyptian citizen.[13]

---

[13]     Plaintiffs observe that Susanne P. Wahba was not a dual national and that the
companies listed as plaintiffs in this case were United States corporations.  Despite these
contentions, the NBE has put forth evidence that Mahmoud A. Wahba had authority to deal with

The plaintiffs contend, however, that Wahba has been a citizen of the United States since 1975 and, as a result, the NBE was actually dealing with rights to property owned by an American citizen.  To be sure, there is evidence in the record before the Socialist Prosecutor indicating that the Socialist Prosecutor knew that Wahba was an American citizen and would attempt to use that fact to dispose of assets and leave the country.  *E.g.*, Plaintiffs' Response to Defendant's Motion to Dismiss, Ex. 8, Part 1, NBE 327-435.  But the fact remains that the companies to which the NBE extended credit were all Egyptian companies, and the NBE considered Wahba an Egyptian citizen at the time of the transactions and alleged seizures at issue.  The documents, including his passport, identification card, and the corporate formation materials, indicate that Wahba relied on his status as an Egyptian national in his dealings with the NBE.  Under these facts, the expropriation exception does not apply.  Resolution of the expropriation exception argument on this ground renders it unnecessary to consider whether the NBE, as an agency or instrumentality of a foreign state, is capable of "taking" property in the sense referred to in the exception.  *Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000); *Vencendora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation*, 730 F.2d 195, 204 (5th Cir. 1984).

### 2.      Commercial Activity Exception

The commercial activity exception to the FSIA provides subject matter jurisdiction over foreign sovereigns when the plaintiff's claim has a sufficient connection, or more precisely a "jurisdictional nexus," with the United States.  *Stena Rederi AB v. Comision de Contratos del*

---

the assets and that the assets were owned or used in connection with the business activities of Egyptian companies to which the NBE had extended credit.  In short, the record is clear that plaintiffs' representative in all dealings with the NBE was Mahmoud A. Wahba.

*Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*, 923 F.2d 380, 386 (5th Cir. 1991).  To determine whether the commercial activity exception applies, the court asks three questions:  "(1) 'whether the particular conduct giving rise to the claim in question constitutes or is in connection with commercial activity;' (2) whether the relevant activity is sovereign or commercial; and (3) whether the commercial activity has the requisite jurisdictional nexus with the United States."  *Soudavar v. Islamic Republic of Iran*, 186 F.3d 671, 673 (5th Cir. 1999)(quoting *de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1391 (5th Cir. 1985)).  "All three clauses require that the cause of action be 'based upon' a certain act or activity of the foreign state[;] that is, the act or activity must form the basis of at least some element of the cause of action."  *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 892 (5th Cir.), *cert. denied*, 525 U.S. 1041 (1998).  When a claim rests entirely upon activity sovereign in nature, jurisdiction will not exist regardless of any connection the sovereign acts may have with commercial activity.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 357-59 (1993).

Under this exception, jurisdiction exists over a foreign state when the action is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  To satisfy the direct effects prong, the plaintiffs must prove that the effect in the United States was an "immediate consequence" of the foreign state's commercial activity.  *Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992).

The court allowed jurisdictional discovery into the "direct effect" prong of the commercial activity exception.  When it allowed jurisdictional discovery, the court concluded that the plaintiffs had made sufficient allegations into the propriety of jurisdiction under this section of the FSIA.  The

16

Fifth Circuit agreed, and allowed discovery "to establish an act outside the United States; to connect the act to commercial activity outside the United States; and to establish a direct effect in the United States."  The court now reviews the record to assess whether the plaintiffs have satisfied each of these three requirements.

First, the court is mindful that it must focus on the acts of the NBE taken outside the United States to satisfy this exception.  In doing so, the court disregards the activity of the NBE taken in the United States as the pertinent language of the exception requires the court to focus on acts that occurred abroad.  The most serious of the NBE's acts that occurred outside the United States is the NBE's conduct in petitioning the Socialist Prosecutor to seize the assets at issue in this case. Plaintiffs have adduced evidence that NBE engaged in this activity and it occurred outside the United States.

Second, the court may assume, *arguendo*, that this activity of the NBE constituted commercial activity in its own right or was sufficiently "connect[ed] to commercial activity" to satisfy the second requirement of the exception.  It is not disputed that the NBE was engaged in commercial activity when it extended credit facilities to the plaintiffs' companies, and it is reasonable to assume that NBE's conduct in attempting to collect on debts it felt were owing to it is also commercial activity.  *See Weltover*, 504 U.S. at 614 ("the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'")(emphasis in original).

The plaintiffs have failed, however, to satisfy the third requirement because they have not demonstrated that the loss of their interests in the Egyptian assets was a direct effect of the NBE's activity.  The seizure of the assets in this case was ordered by the Egyptian Socialist Prosecutor,

17

albeit on the motion of the NBE.  As a result, although any injuries suffered by plaintiffs in the United States were causally related, in a transactional sense, to the commercial acts of the NBE, this court cannot say that the alleged injuries were the "immediate consequence" of this activity under *Weltover*.

Even if the court could disregard the role of the Socialist Prosecutor and "deem" the acts of the Socialist Prosecutor to be those of the NBE, the court would still be convinced that the direct effect of the activity was felt in Egypt, not the United States.  The structure of the various transactions supports this conclusion.  Viewed in their natural and most general sense, the transactions were all centered in Egypt.  The plaintiffs invested in Egyptian markets.  To conduct his businesses in Egypt, Wahba established Egyptian companies that entered into loan agreements to borrow Egyptian pounds with the NBE, a state-owned Egyptian bank.  The credit agreements were written in Arabic and called for the resolution of disputes in Egypt by Egyptian courts.  Wahba claims that his business failures were caused by the sovereign acts of the Egyptian government in protecting the state's labor force.  As a result, although Wahba has pointed to isolated instances in which bank officers met with Wahba in the United States, the transactions and commercial ventures were centered in Egypt.  The NBE could therefore reasonably conclude that the direct effects of any collection activities would be immediately felt in Egypt.  *See Stena Rederi AB v. Comision de Contratos del Comite Ejecutive General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*, 923 F.2d 380, 390 (5th Cir. 1991)("Stena is a Swedish corporation; any financial loss it has suffered affects Sweden, not the United States.").  When the court considers the circumstances surrounding the transactions in light of Wahba's use of his Egyptian citizenship in dealing with the NBE and in setting up "the vehicle of [his] investments," the court is persuaded

that this case is distinguishable from *Byrd v. Corporacion Forestal Y Industrial De Olancho S.A.*, 182 F.3d 380, 390 (5th Cir. 1999)(recounting that one of the facts on which the plaintiffs relied was the "[a]ppellants' knowledge and implicit consent, every step of the way, that Americans were being involved in the project.").

The plaintiffs rely on Fifth Circuit decisions in support of their contention that the effects they suffered in the United States were "direct effects" under the commercial activities exception. In *Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir. 1985), the Fifth Circuit held that a financial loss incurred in the United States by an American plaintiff may constitute a direct effect that supports jurisdiction under the third clause of the commercial activities exception. *Callejo*, 764 F.2d at 1111-12. In that case, the plaintiffs purchased certificates of deposit from the defendant, a nationalized bank of Mexico. The plaintiffs had wired money for deposits from their Texas bank through an intermediary bank to the bank in Mexico. Interest payments were made to the plaintiffs' Texas bank by the bank in Mexico in the reverse order. The Mexican government adopted exchange control regulations, and the bank notified the plaintiffs it would thereafter pay interest and principal to the plaintiffs in pesos, rather than dollars, at rates that were substantially lower than market rates. The plaintiffs sued the bank for breach of contract. The court held that the bank's failure to pay at higher rates resulted in a direct effect felt to plaintiffs in the United States.

In *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887 (5th Cir. 1998), the Fifth Circuit applied the holding in *Callejo* and concluded that jurisdiction existed under the FSIA's commercial activities exception. In that case, an American corporation designated a Texas bank for payment on a letter of credit issued by the Bank of China. The bank conceded that its customary practice was to send payments on a letter of credit to wherever the presenting party specified, as long

19

as the necessary documents were conforming.  The bank, however, failed to pay on the letter of credit.  Thereafter, the corporation sued, contending that jurisdiction over the state-owned bank existed under the FSIA.  The Fifth Circuit, applying *Callejo*, agreed with the plaintiff that the bank's act, the failure to pay, caused a direct effect in the United States (the non-receipt of funds).

These cases are distinguishable.  Not every financial loss suffered by an American citizen is sufficient to satisfy the requirement of the direct effects clause.  The *Voest-Alpine* court specifically cautioned that "*Callejo* did not hold that any financial loss suffered by an American plaintiff, regardless of where that loss was incurred, is alone sufficient to constitute a direct effect under the third clause." *Voest-Alpine*, 142 F.3d at 887 n.11.  Rather, in these cases, the "act" was a failure to pay money to locations in the United States in commercial banking transactions.  The injury found to be a direct effect was loss of the funds within the United States to American plaintiffs.  In this case, the commercial activity alleged was directed toward the seizure of assets located in Egypt to satisfy debts incurred in Egypt.  The direct effect was the loss of assets in Egypt.

The plaintiffs have failed to demonstrate that jurisdiction exists under the "direct effects" prong.  The entity responsible for seizing the assets was the Egyptian Socialist Prosecutor.  There is no contention that any act of the Socialist Prosecutor was commercial in nature.  Instead, the plaintiffs contend that the Socialist Prosecutor ordered a seizure that was out of step with international norms.  Even if the acts of the Socialist Prosecutor were imputed to NBE, the immediate consequences of the Socialist Prosecutor's activities occurred in Egypt, not the United States.  The court therefore cannot sustain jurisdiction under this exception.

In the memorandum opinion allowing jurisdictional discovery, the court alluded to two other prongs of the "commercial activities" exception.  These authorize jurisdiction over claims based on

commercial activity carried on in the United States by the foreign state and claims based on acts performed in the United States in connection with commercial activity carried on outside the United States.  The plaintiffs contend that proof of these exceptions to immunity also exist under this record.

"Commercial activity carried on in the United States by the foreign state" is defined as "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e).  "Commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  Despite the plaintiffs' arguments to the contrary, the court concludes that the plaintiffs' claims are not based on NBE's commercial activities within the United States.  The NBE's contact with the United States with respect to these transactions was sporadic.  As noted, the bank's commercial activity was financing the plaintiffs' Egyptian companies.  The plaintiffs' cause of action is not "based on" commercial activity of the NBE in the United States, and the first prong of the commercial activity exception to the FSIA does not apply.

The second prong of the commercial activity exception also does not apply.  This exception allows for jurisdiction if a claim is based on a noncommercial act of the foreign sovereign in the United States in connection with commercial activity conducted outside the United States.  The plaintiffs in this case contend that their claims are based on certain activity in the United States to solicit their investment and to coerce Mahmoud Wahba to sign the 1999 settlement agreement.  The activity of the NBE that is the basis for plaintiffs' causes of action, however, is the petitioning of the Socialist Prosecutor to seize the assets located in Egypt.  NBE's petitioning activity is related to its activity in the United States (Wahba signed the settlement agreement here), but, as the NBE points out, "plaintiffs state that they suffered financial losses resulting from the policy decisions of the

21

Egyptian government and the seizure of the Egyptian assets of Wahba's Egyptian companies by the

Socialist Prosecutor."  Defendant National Bank of Egypt's Brief and Evidence in Support of its

Motion to Dismiss and Reply to Plaintiff's Production of Evidence, at 25.  These activities occurred

in Egypt, and the second prong of the commercial activities exception does not support jurisdiction.

## IV.    Conclusion.

The court has carefully considered the extensive record submitted by the parties.  Although

the issues are close, the court is persuaded that the NBE has carried its burden to demonstrate the

court lacks subject matter jurisdiction over this case.  Neither the expropriation nor the commercial

activities exceptions apply to this case.  The court accordingly grants the NBE's motion to dismiss

the case for lack of jurisdiction and dismisses this case.  All other pending motions are denied as

moot, including the NBE's motion to strike.  The court considered fully the submissions of both

sides of this case.

SIGNED this 29th day of September, 2006.

_T. John Ward_

T. JOHN WARD
UNITED STATES DISTRICT JUDGE